**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| AIMEE L. WAHLERS, individually and as the surviving mother of Decedent, KATLYN NICOLE ALIX, deceased,  )<br>)<br>)<br>)<br>Plaintiff(s),  )<br>)<br>vs.  )<br>)<br>NATHANIEL HENDREN, in his individual and official capacity, et al.,  )<br>)<br>)<br>Defendant(s).  ) | Case No. 4:19-cv-03064-SRC |

**MEMORANDUM AND ORDER**

Katlyn Alix died of a gunshot wound inflicted by her fellow police officer and romantic partner Nathaniel Hendren after both consumed alcohol at Hendren's apartment. Alix's mother, Aimee Wahlers, sues Hendren, his police partner, their supervisor, and the city that employs them for damages for the wrongful death of her daughter. Wahlers claims the defendants acted under color of state law and therefore are liable for her daughter's death under federal civil rights law (42 U.S.C. § 1983) and state law. Because the Court finds that Hendren's actions had no legal connection to his status as a police officer and he therefore did not act under color of state law, the Court grants [15] the Defendants' Motion to Dismiss the federal claims. Wahlers must pursue her suit for damages under state law in state court.

**I.      BACKGROUND**

For purposes of deciding the motion to dismiss under Rule 12(b)(6), the Court presumes true the well-pleaded facts in the Complaint, briefly summarized here.

1

In the early morning hours of January 24, 2019, Hendren shot and killed Alix;[1] Alix and Hendren were in a romantic relationship, and the shooting occurred at Hendren's apartment. In the early evening of January 23, 2019, Alix, who was off duty, texted Hendren to say that she was going to come to his apartment to bring him medicine for a cold. Hendren was scheduled to work the night shift later that evening. After Alix arrived at Hendren's apartment, the two proceeded to make dinner together. Despite having to work that night, Hendren consumed an unknown quantity of alcohol before reporting for duty.

Hendren's shift began shortly before 11:00 p.m. From the start of their shift through the time of the shooting, Hendren and his police-patrol partner, Patrick Riordan, were in uniform and on duty. Hendren and Riordan drove a GPS-equipped police cruiser. St. Louis City Police Department policy requires officers to log in on the vehicle computer to trigger the GPS system, and prohibits officers from tampering with or disabling the GPS system in any way. However, their location could not be tracked because Hendren and Riordan either did not log in or manipulated the GPS system. Defendant Gary Foster, a police sergeant with the Department, was Hendren and Riordan's supervisor that evening. Foster failed to ensure that Hendren and Riordan properly enabled the GPS system.

Just a few minutes after their shift began, Hendren and Riordan texted Alix that they could use a "beginning of shift smoke" and asked her whereabouts. Soon after, Hendren and Riordan received a call from dispatch regarding an assault and reported to the incident. Afterwards, Riordan told Alix to meet them at Hendren's apartment.

The Police Department divides the City of St. Louis into six patrol districts. The Department assigned Hendren, Riordan, and Alix to District 2. Although Hendren and Riordan

---

[1] The state criminally charged Hendren for Alix's homicide, and he pled guilty to Involuntary Manslaughter - First Degree. *See State v. Hendren*, Cause No. 1922-CR00289-01 (Circuit Court of St. Louis City, Missouri).

2

were supposed to be on patrol in District 2, Hendren's apartment was located in District 1.  Alix, still off duty, arrived at Hendren's apartment at 11:45 p.m.  Around the same time, Hendren and Riordan received a call about a triggered building alarm in their patrol area.  Ignoring the call, they instead arrived at Hendren's apartment a few minutes after Alix.

Riordan then texted Officer Phillip Vonderheydt, another Department officer, and asked him to investigate the building alarm.  Vonderheydt and Riordan exchanged text messages about why Hendren and Riordan were not responding to the alarm.  Shortly after midnight, Riordan stated via text to Vonderheydt: "F*ck it I'm just coding it."  Vonderheydt replied: "WTF dude.  What's so important you can't take this call?  Call dispatch and say you are on something.  And they send [another officer]."  Five minutes later, Hendren and Riordan improperly coded the alarm call an "F," or false alarm.

At the apartment, Hendren and Riordan proceeded to consume alcohol and other unknown substances while on duty—in direct contravention of Department policy.  Both Hendren and Alix became intoxicated.   Soon after, Hendren's neighbors reported hearing a "screaming fight" and yelling between a man and a woman.

A tragedy then began.   Hendren took out his personal revolver.  He put a single bullet in the revolver and spun the cylinder.  He "dry fired" the revolver multiple times while pointing the weapon down the hallway.  Finally, Hendren pointed the revolver at Alix's chest and pulled the trigger once more.  The weapon fired and the bullet struck Alix in the chest, killing her.

After Riordan phoned District 2 dispatch to report an "officer down," he and Hendren took Alix to a nearby hospital in their police cruiser.  Later that morning, the hospital pronounced Alix dead.

Wahlers brings suit individually and on Alix's behalf, asserting both state law claims (Counts I through VII) and claims under 42 U.S.C. § 1983. Wahlers asserts § 1983 claims against Hendren for excessive force (Count VIII) and for violation of Alix's substantive due process rights to bodily integrity (Count IX). She also brings § 1983 claims against Riordan for failure to intervene (Count X) and against the City of St. Louis for "deliberately indifferent policies, customs, hiring, training, retention and supervision in violation of the Fourteenth Amendment" (Count XI).

Defendants move under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Wahlers's § 1983 claims, arguing that these claims necessarily fail because Hendren did not act under color of state law when he shot Alix. Doc. 15 at ¶ 4.

**II.     STANDARD**

Under Rule 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The notice pleading standard of Rule 8(a)(2) requires a plaintiff to give "a short and plain statement . . . showing that the pleader is entitled to relief." To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872-73 (8th Cir. 2010).

4

When ruling on a motion to dismiss, a court must liberally construe a complaint in favor of the plaintiff. *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recovery on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79. "A pleading that merely pleads labels and conclusions or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of factual enhancement will not suffice." *Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir. 2010) (internal quotations omitted). Although courts must accept all factual allegations as true, they are not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted); *Iqbal*, 556 U.S. at 677-78.

Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 679. Therefore, a court must determine if the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Id*. This "context-specific" task requires the court to "draw on its judicial experience and common sense." *Id*. at 679, 682. In determining the plausibility of a plaintiff's claim, *Iqbal* and *Twombly* instruct the Court to consider whether "obvious alternative explanations" exist for the allegedly unconstitutional conduct. *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567. The Court must then determine whether the plaintiff plausibly alleges a violation of the law. *Iqbal*, 556 U.S. at 682. The well-pleaded facts must permit more than the "mere possibility of misconduct." *Id.* at 679. "Where a complaint pleads

facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557).

### III.   DISCUSSION

Section 1983 imposes liability on any person who, acting "under color of any statute, ordinance, regulation, custom, or usage, of any State[,]" causes a deprivation of federally-secured rights. 42 U.S.C. § 1983; *see also West v. Atkins,* 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff ... must show that the alleged deprivation was committed by a person acting under color of state law.").

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West*, 487 U.S. at 49 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). "It is firmly established" that a person who is acting unlawfully still acts under color of state law "when he abuses the position given to him by the State." *Id.* at 49-50.

The Eighth Circuit has stated that "under 'color' of law means under 'pretense' of law." *Roe v. Humke*, 128 F.3d 1213, 1216 (8th Cir. 1997) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)). "Thus acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." *Id.* "Absent any actual or purported relationship between the officer's conduct and his duties as a police officer, the officer cannot be acting under color of state law." *Id.*

The City moves to dismiss Wahlers's § 1983 claims, arguing that Hendren did not act under color of state law in shooting Alix because he did not commit that act "in the performance of any actual or pretended duty as a police officer." Doc. 30 at 2. "Whether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the officer's official duties." *Roe*, 128 F.3d at 1216 (quoting *Martinez v Colon*, 54 F.3d 980, 986 (1st Cir. 1995)). In *Roe*, the defendant police officer sexually assaulted a child he met through his duties as a school-safety officer. *Id.* at 1214-15. When the officer met his victim at her school, he was in uniform and sitting in his patrol car. *Id.* at 124. He encountered her regularly through his duties at the school, talking to her "three or four times a week," giving her rides home, and buying her candy and other gifts. *Id.* While on duty at the school and in uniform, he suggested multiple times that she accompany him to his farm to ride all-terrain vehicles. *Id.* After the child finally agreed, the officer picked her up at her home, off duty and in his personal vehicle, and brought her to his farm, where he assaulted her. *Id.* at 1214-15. The child's mother brought § 1983 claims against the officer and the chief of police. *Id.* at 1218. The Eighth Circuit determined that the officer did not act under color of state law because he "took [the child] to his farm *for his own personal pursuits*, not for any purpose legitimately or purportedly related to the exercise of his responsibilities as a police officer." *Id.* at 1216 (emphasis added).

The City argues that Hendren's shooting of Alix was not related in any meaningful way to his duties as a police officer. Doc. 19 at 6-7. The Court agrees. At the time of the shooting, Hendren and Riordan, though ostensibly "on duty," were willfully and deliberately shirking their responsibilities as police officers. They disabled the GPS system on their police cruiser so they could not be tracked, left their patrol district without permission, and ignored a call for service,

7

blithely coding the call as a false alarm.  Wahlers herself alleges that Hendren and Riordan went to Hendren's apartment "for personal reasons."  Doc. 3 at ¶¶ 168, 193.  There, they proceeded to consume alcohol and "other unknown substances" while on duty, in direct violation of Department policy.  *Id.* at ¶ 65.  Finally, Hendren, intoxicated, proceeded to take not his Department-provided service revolver but his personal revolver, "loaded it, pointed it at Katlyn Nicole Alix's heart and chest, pulled the trigger, and killed her."  *Id.* at 91.

Wahlers has not plausibly alleged Hendren was acting under color of state law when he shot and killed Alix.  Like the officer in *Roe*, Hendren went to his apartment "for his own personal pursuits, not for any purpose legitimately or purportedly related to the exercise of his responsibilities as a police officer."  128 F.3d at 1216.  Accordingly, Hendren's killing of Alix "while reprehensible and to be condemned in the strongest possible terms, was a private tort committed by a person acting in a purely private capacity."  *Id.* at 1218.

Wahlers argues that the City's Motion should be denied because whether Hendren acted under color of state law is a disputed question of fact for the jury.  Doc. 28 at 8-9.  For purposes of ruling on the City's 12(b)(6) motion to dismiss, the Court accepts as true all of Wahlers's well-pleaded factual allegations.  *Iqbal*, 556 U.S. at 678.  Accordingly, at this stage the Court must ask not whether any fact alleged by Wahlers is disputed, but whether the totality of those allegations "plausibly give rise to an entitlement to relief."  *Id.* at 679.  Wahlers alleges that Hendren and Riordan "at all times relevant, [were] acting under the color of the statutes, ordinances, regulations, customs, and laws of the State of Missouri".  Doc. 3 at ¶¶ 151, 183.  But the Court cannot and does not accept this quintessential legal conclusion as true.  *Iqbal*, 556 U.S. at 677-78.

Wahlers further argues "in the 8th Circuit, whether a person was acting under color of state law is a deeply rooted factual question to be determined by the jury." Doc. 28 at 8. While on occasion courts do submit the color-of-state-law question to the jury, as in cases Wahlers cites, courts properly determine the question at the pleadings stage. *See, e.g., Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532 (8th Cir. 2014) (affirming district court's 12(b)(6) dismissal for failure to state a claim where complaint did not plausibly allege defendant acted under color of state law); *Sabri v. Whittier All.*, 833 F.3d 995, 1000 (8th Cir. 2016) (same); *Chapman v. Musich*, 726 F.2d 405, 408 (8th Cir. 1984) (same); *see also Moore v. City of St. Louis*, No. 4:17-CV-01912 JAR, 2018 WL 1513336, at *2 (E.D. Mo. Mar. 27, 2018); *McKee v. Reuter*, No. 4:16 CV 207 CDP, 2016 WL 6804559, at *5 (E.D. Mo. Nov. 17, 2016); *Holloway v. Ameristar Casino St. Charles, Inc.*, No. 407 CV 218 DDN, 2007 WL 2199566, at *5 (E.D. Mo. July 27, 2007).

Wahlers also relies on the Eighth Circuit's model jury instructions to support her question-of-fact assertion. Doc. 28 at 8. But the committee comment to the instructions provides just the opposite: "The court should, if possible, rule on the record whether the conduct of the defendant, if it occurred as claimed by the plaintiff, constitutes acting under color of state (county, municipal) law and should not instruct the jury on this issue." *Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit*, Instruction 4.20 Definition: Color of State Law (42 U.S.C. 1983), committee comment.

Wahlers next argues that she has alleged sufficient factual matter "taken as true, from which a jury could find Defendant Hendren was acting under color of state law, including the fact he was on duty." Doc. 28 at 9. A police officer's duty status is relevant to the color-of-state-law analysis, but the law requires the Court to look at the totality of the facts. *See Magee*,

9

747 F.3d at 535 ("Factors include: whether the officer is on duty and in uniform, the motivation behind the officer's actions, whether the officer had access to the victim because of his position, and whether the officer threatened official conduct in the future."); *see also Martinez v Colon*, 54 F.3d 980 (1st Cir. 1995) (police officer did not act under color of state law, though on duty and in uniform, where his "hazing" of a fellow officer culminated in accidentally shooting the officer with his service weapon); *Morris v. City of Detroit, Michigan*, 789 F. App'x 516 (6th Cir. 2019) (officer did not act under color of state law when, while on duty and displaying her badge, she attempted to collect a personal debt and discharged her service weapon); *Gomez v. City of New York*, No. 15-CV-7524 (JPO), 2017 WL 3736693 (S.D.N.Y. Aug. 29, 2017) (dismissing complaint under 12(b)(6) because on-duty officer did not act under color of state law when he intentionally discharged his department-issued pepper spray on a fellow officer).

The Court finds *Martinez v. Colon*, cited approvingly by the Eighth Circuit in *Roe*, 128 F.3d at 1216, particularly relevant here. In *Martinez*, the plaintiff was a young police officer who brought suit under § 1983 after a fellow officer accidentally shot him in a hazing incident at the police station. 54 F.3d at 983. The officer repeatedly pointed his service weapon at the plaintiff, calling him a "pretty boy" and asking if he was scared. *Id.* at 982. Finally, the officer pointed his gun at the plaintiff's groin, threatening to "blow away" his genitals. The gun discharged, maiming the plaintiff. *Id.* The First Circuit held that the officer, though on duty and in uniform, did *not* act under color of state law:

> Here, the record is transpicuously clear that throughout the course of Martinez' ordeal Valentin did not exercise, or purport to exercise, any power (real or pretended) possessed by virtue of state law. To the contrary, Valentin was bent on a singularly personal frolic: tormenting an acquaintance. Though on duty and in uniform, Valentin's status as a police officer simply did not enter into his benighted harassment of his fellow officer. Hazing of this sort, though reprehensible, is not action under color or pretense of law.

*Id.* at 987.


As *Martinez* illustrates, the Court must ask not whether Hendren was technically "on duty" when he shot Alix, but whether, in doing so, he "exercise[ed], or purport[ed] to exercise, any authority (real or pretended) possessed by virtue of state law." *Id.* The Court must assess Plaintiff's allegations using "common sense" to determine whether "obvious alternative explanations" exist. Iqbal, 556 U.S. at 682. Here, the obvious explanation for Hendren's conduct is that, like the defendant in *Martinez*, he was "bent on a singularly personal frolic" that had no connection to his duties as a police officer. 54 F.3d at 987.

In support of her claim that Hendren was acting under color of state law, Wahlers alleges that Hendren was on duty, in uniform, and traveled to the apartment in his police vehicle. Doc. 3 at ¶ 183. But these "official trappings" of Hendren's status as a police officer lose much of their significance here because Alix, Hendren's victim, was herself a police officer. As the First Circuit observed in *Martinez:*

> Had Martinez been a civilian rather than a fellow officer, the significance of Valentin's uniform and weapon for purposes of the color-of-law determination might well have been greater. *See, e.g., Jones v. Gutschenritter*, 909 F.2d 1208, 1212–13 (8th Cir. 1990) (observing that the presence of a uniformed and armed police officer may reasonably cause a civilian to refrain from taking action to protect his rights). But when the victim is himself a fellow officer and the particular interaction between the two officers is of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state and, in turn, to forgo exercising his legal rights.

54 F.3d at 988 n.6; *see also Gomez*, 2017 WL 3736693, at *4 ("In the typical case, these indicia of authority could certainly compel the conclusion that [defendant] was acting under color of state law. But this case differs in one crucial respect from the typical case: Unlike the usual plaintiff bringing a § 1983 action against a police officer, [plaintiff] is a police officer himself."). Not only were Alix and Hendren fellow police officers, they shared a consensual romantic relationship. Alix came to Hendren's apartment voluntarily. As a fellow police officer, Alix

11

knew that Hendren and Riordan were outside of their assigned district, were shirking their duties, and were violating Department policy by consuming alcohol and other substances while ostensibly on duty. These facts show that the interaction between Hendren and Alix that night was "of a distinctively personal nature." *Martinez*, 54 F.3d at 988 n.6. Furthering this conclusion, Hendren shot Alix not with his Department-issued service revolver but with his personal revolver.

Finally, Wahlers argues that Hendren was acting under color of state law because he only had access to Alix because he was abusing his power as a police officer. Doc. 28 at 15. "[W]hether the officer had access to the victim because of his position" is a relevant factor in the color-of-state-law analysis. *Magee*, 747 F.3d at 535. However, Wahlers has not plausibly alleged that Hendren had access to Alix because of his position as a police officer. As noted, Alix and Hendren were romantically involved. Alix came to Hendren's apartment voluntarily— just as she had been earlier the same evening when the two made dinner together. Wahlers's allegations make plain that Hendren's position as a police officer played no role in his access to Alix. The Eighth Circuit's holding in *Roe* buttresses this conclusion. There, the officer's relationship with the child he sexually assaulted arose from his access to the child as a uniformed school-safety officer; yet, the Eighth Circuit affirmed the District Court's summary judgment, finding that the assault at his personal farm was "for his own personal pursuits[.]" 128 F.3d at 1216.

The cases cited by Wahlers are each distinguishable, and actually illustrate the shortcoming of her "access" argument. Wahlers first cites *United States v Colbert*, 172 F.3d 594 (8th Cir. 1999). In *Colbert*, a police officer assaulted an inmate in a restricted area of the jail that he could only access because of his position as a police officer. *Id.* at 596. Wahlers also relies

on *Rogers v. City of Little Rock*, 152 F.3d 790, 798 (8th Cir. 1998). In *Rogers*, the Eighth Circuit found the defendant "relied on his authority as a police officer to facilitate the assault" where the officer stopped a woman for a broken tail light, threatened to tow her car, and then followed her home where, after suggesting she owed him a favor in exchange for letting her go, he sexually assaulted her. *Id.* Similarly, in *Griffin v City of Opa-Locka*, 261 F.3d 1295 (2001) the Eleventh Circuit found that a city manager acted under color of state law where he "invoked his authority as City Manager to create the opportunity to be alone with [the plaintiff], to take her home, and then to rape her." *Id.* at 1304. And in *United States v. Giordano*, 442 F.3d 30 (2006), the Second Circuit held that a mayor acted under color of state law when he sexually abused two minor victims where he "threatened his victims by invoking a 'special authority' to undertake retaliatory action" and "used his authority to cause the victims to submit to repeated abuse." *Id.* at 45.

In each of these cases cited by Wahlers, the defendant used the authority of his office to facilitate his assault. Here, Hendren and Alix shared a preexisting romantic relationship, and Alix twice voluntarily came to Hendren's apartment that evening, where Hendren shot and killed her with his personal revolver. Wahlers argues that Hendren's "encounter with Alix was made possible only because he was abusing his power as a state actor." Doc. 28 at 15. It may be true that, had Hendren not shirked his police duties that evening, he would not have met Alix at his apartment. But this does not mean Hendren used his authority as a police officer to facilitate the assault; the facts Wahlers alleges demonstrate just the opposite—Hendren encountered Alix at his apartment *despite* and in contravention of his authority as a police officer, not because of it.

For these reasons, the Court finds that Wahlers has not plausibly alleged Hendren acted under color of state law when he shot and killed Alix. Accordingly, Wahlers's § 1983 claims

13

against Hendren for excessive force (Count VIII) and violation of bodily integrity (Count IX) fail as a matter of law. *West*, 487 U.S. at 48 ("To state a claim under § 1983, a plaintiff ... must show that the alleged deprivation was committed by a person acting under color of state law."). Wahlers's claims against Hendren in his official capacity are actually claims against the City. *Robb v Hungerbeeler*, 370 F.3d 735, 739 (8th Cir. 2004) ("Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (internal quotations omitted).  In the present motion, the City moves to dismiss Wahlers's claims against Hendren in his official capacity only.  However, having determined these claims necessarily fail as a matter of law, the Court dismisses Wahlers's § 1983 claims against Hendren (Counts VIII and IX) in both his official and individual capacities. *Smith v. Boyd*, 945 F.2d 1041, 1043 (8th Cir. 1991) ("district court sua sponte may dismiss a complaint under Rule 12(b)(6) as long as the dismissal does not precede service of process").

Because the Court dismisses Wahlers's § 1983 claims against Hendren, Wahlers's remaining § 1983 claims also necessarily fail as a matter of law.  Wahlers's claim against Riordan for failure to intervene (Count X) must be dismissed because an officer's failure to protect against merely private violence is not cognizable under § 1983. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989); *see also Martinez*, 54 F.3d at 990 (no § 1983 claim against onlooker police officers for failure to intervene where actions causing injury were not taken under color of state law).  Similarly, Wahlers's § 1983 claim against the City (Count XI) must be dismissed because no municipal liability attaches under § 1983 absent an underlying constitutional violation. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007) ("[I]n order for municipal liability to attach, individual liability first must be found on an

underlying substantive claim."). Accordingly, the Court dismisses Counts X and XI for failure to state a claim.

A.     **Remand**

Wahlers's remaining claims sound only in state law. A district court may exercise supplemental jurisdiction over state law claims that form part of the "same case or controversy" as claims over which the court has original jurisdiction. 28 U.S.C.A. § 1367(a). However, "[a] district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); 28 U.S.C.A. § 1367(c).

Here, the Court dismisses all claims over which it had original jurisdiction. The Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See Gregoire v. Class*, 236 F.3d 413, 420 (8th Cir. 2000) ("[T]he judicial resources of the federal courts are sparse compared to the states. We stress the need to exercise judicial restraint and avoid state law issues wherever possible.") (quoting *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990)).

Accordingly,

**IT IS HEREBY ORDERED** that Counts VIII-XI of Plaintiff's Complaint are dismissed.

**IT IS FURTHER ORDERED** that that that this matter is remanded back to the Circuit Court of St. Louis City. Pursuant to 28 U.S.C. § 1447(c), the Clerk of the Court shall mail a certified copy of this order of remand to the clerk of the State court.

So Ordered this 22nd day of April, 2020.

*SLR.CR*

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**